**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF GEORGIA
SAVANNAH DIVISION**

JSM MARINE LLC,

        Plaintiff,

    v.

CLAUDIA N. GAUGHF,

        Defendant.

CIVIL ACTION NO.: 4:18-cv-151

**O R D E R**

On June 19, 2018, Plaintiff JSM Marine LLC filed a Complaint in Admiralty seeking an award of $7,144.00, pursuant to the law of salvage, for services rendered to Defendant Claudia N. Gaughf's vessel—the MIST APPROACH—following Hurricane Matthew in October of 2016. (Doc. 1.) Presently before the Court are Plaintiff's Motion for Summary Judgment and Attorney's Fees, (doc. 16), and Defendant's counter Motion for Attorney's Fees, (doc. 31). Both matters have been fully briefed and are ripe for resolution. (See Docs. 16, 23, 36 (Briefing on Plaintiff's Motion); 31, 37, 39 (Briefing on Defendant's Motion).)

Plaintiff seeks summary judgment on both liability and damages, claiming that the services it rendered to the MIST APPROACH constitute maritime salvage. (Doc. 16.) Briefly stated, the parties in this case primarily dispute whether the MIST APPROACH was in "marine peril" as a matter of law when Plaintiff rendered its services to recover the vessel and, thus, whether Plaintiff is due an award under the law of salvage for those services. (See Docs. 16, 23, 36.) As for attorney's fees, the parties dispute the reasonableness of Defendant's position that the vessel was not in "marine peril" and related discovery issues. (See Docs. 16, 23, 31, 36, 37, 39.)

After careful consideration and for the reasons explained below, the Court **GRANTS** Plaintiff's Motion for Summary Judgment and Attorney's Fees, (doc. 16), and **DENIES** Defendant's Motion for Attorney's Fees, (doc. 31). The Court **DIRECTS** the Clerk of Court to enter judgment in favor of Plaintiff in the amount of $7,144.00. The Court **ORDERS** Plaintiff to respond within **twenty-one (21) days** from the date of this Order with additional evidence regarding the amount and scope of attorney's fees requested, Local R. 54.2, and **ORDERS** Defendant to respond within **twenty-one (21) days** from Plaintiff's filing with any opposition, Local R. 7.5.

## BACKGROUND

On October 7, 2016, Hurricane Matthew made landfall in the Savannah, Georgia area. (Doc. 16, p. 2.) It caused considerable damage along the Wilmington River where the salvage at issue occurred. (Id.) The hurricane "destroyed" Defendant Claudia N. Gaughf's "dock and the boatlift securing [her] vessel," the MIST APPROACH.[1] (Doc. 23, p. 2.) In the process, Hurricane Matthew deposited the MIST APPROACH, which had been fastened to the raised boat lift, directly beside a dock located four houses down from Defendant's waterfront residence along the Wilmington River. (Id. at pp. 1–2.) The hurricane pulled the vessel "away from its mooring and pushed it partially ashore" down river. (Doc. 16-2, p. 3; doc. 16-3, p. 2.) The MIST APPROACH came to rest on, and was surrounded by, hurricane debris. (Doc. 23, p. 2.) From this position, the MIST APPROACH was at least partially grounded with its bow resting on a rocky area of the river bank and its starboard side touching the dock's second piling from the shore. (See Doc. 25-1, pp. 1–13 (photographs provided by Defendant taken prior to salvage); doc. 16-4, pp. 10–23, 28

---

[1] The MIST APPROACH vessel is a 2007 Grady White 228 Seafarer owned by Defendant. (Doc. 23, p. 1; doc. 16-7, p. 2.) The Grady White 228 Seafarer is a 22-foot walkaround cabin boat designed for saltwater offshore fishing function as well as inshore use. Grady-White Boats, Seafarer 228, Models, https://www.gradywhite.com/models/walkaround-cabins/seafarer-228/ (last visited Sept. 3, 2019).

(photographs provided by Plaintiff taken at the time of salvage); see also doc. 16-5, pp. 2–14 (higher quality versions of Defendant's photographs, filed by Plaintiff).) It remained in this position until Plaintiff removed the vessel on October 18, 2016. (Doc. 23, p. 3.)

When Hurricane Matthew made landfall, Defendant and her husband, Mr. Scott Birthisel, were evacuated out of state and did not return home until October 9, 2016. (Id. at pp. 1–2.) During the interim, Mr. Birthisel reported the hurricane to the vessel's insurance company and had an individual named Leon Barnard tie the vessel to the adjacent dock. (Id. at p. 2; doc. 32, pp. 3–5.) Following the hurricane, Plaintiff JSM Marine LLC, a company specializing in marine construction, towing, salvage, and related operations, came to the Wilmington River to provide its services in the post-hurricane cleanup and recovery effort. (Doc. 16, p. 4.) Upon first surveying the relevant scene, Plaintiff's general manger, Mr. Karl Robin Rodgers, noticed the MIST APPROACH sitting "aground" on the "riprap bank of the river and surrounded in debris." (Id.)

At this time, however, Plaintiff did not perform any salvage services on the MIST APPROACH, despite Mr. Rodgers' opinion that the vessel faced the specter of additional damage due to its precarious position. (Id. at pp. 4–5.) Plaintiff declined assist to the MIST APPROACH initially because it "was engaged in other work at the time." (Id. at p. 5.) Days later, before engaging in the salvage operation, Mr. Rodgers approached the persons occupying the property where the MIST APPROACH lay to inquire if they were the owners of the boat, and discovered they were not. (Id.) Nonetheless, Mr. Rodgers asked for, and received, their permission to access the river bluff located on their property in order to salvage the vessel. (Id.)

Meanwhile, Mr. Birthisel had returned to the area and began periodically checking on the MIST APPROACH. (Doc. 23, pp. 4, 10.) Over the course of at least five visits, the MIST APPROACH remained unmoved and tied to the neighbor's dock without incurring any additional

damage.[2]  (Id.)  On October 17, 2018, the day before Plaintiff engaged in salvage operations, an adjuster of the vessel's insurer, Mr. Robert Egbert, came to inspect, and he did not observe any severe structural damage.  (Id. at p. 3.)  According to Defendant, the "vessel was basically immobilized due to the debris."  (Id.)  Further, Defendant states the vessel was not leaking any fuel or lubricant, had not taken on any water, and had not sustained any observable damage from the dock or from nearby rocks and debris.[3]  (Id. at pp. 3–4.)  From the end of Hurricane Matthew until Plaintiff retrieved the boat from the debris, Defendant asserts the MIST APPROACH had been in the same situation for over a week and "sustained no damage as a result of that situation." (Id. at p. 4.)  Defendant's insurer had planned to "arrange for someone to tow the vessel from [its] location," but Plaintiff's salvage operation took place before these arrangements could be made. (Id. at p. 3.)

On October 18, 2016, Plaintiff returned to the subject portion of the Wilmington River and salvaged the MIST APPROACH.  (Doc. 16, p. 5.)  Plaintiff was unsuccessful in its attempt to identify and contact Defendant, and so it undertook the salvage operation without Defendant's permission.[4]  (Id. at pp. 5, 7.)  Indeed, Plaintiff rendered salvage services to the MIST APPROACH

[2]  Plaintiff likewise states the MIST APPROACH "was in the same position" at the time of salvage as it was when first observed days prior.  (Doc. 16, p. 1.)

[3]  Additionally, by way of her husband's declaration, Defendant also claims the MIST APPROACH could have extricated itself "under its own power" if the surrounding debris had been cleared "because the engine was still operable."  (Doc. 25, p. 3.)  In his declaration, Mr. Birthisel also claims the only relevant damage to the engine was to its casing.  (Id.)  However, other than the naked assertion itself, Mr. Birthsiel offers no support for his claim that the MIST APPROACH had an operable engine and the potential to remove itself from the debris-strewn bank of the Wilmington River.  (See generally id.)  Plaintiff staunchly disputes this claim and argues it is belied by Defendant's admissions, Mr. Birthisel's earlier deposition testimony, the testimony of other witnesses, and repair records.  (See Doc. 36, pp. 6–7, 10–17.)  Although this issue is discussed in-depth below, the Court notes here that undisputed evidence shows the MIST APPROACH's engine was replaced after repair estimates projected the cost of repair in excess of $3,000.00  (See id. at p. 17; doc. 16-7, pp. 2, 6.)

[4]  Plaintiff attempted to locate Defendant by consulting with the Georgia Department of Natural Resources based on the MIST APPROACH's state-registration, but its search proved fruitless because the vessel had

4

without "being required to do so by existing duty or special contract." (Id. at p. 5.) According to Plaintiff, the day of salvage was the first time it "approached the vessel closely enough to see its condition." (Id.) Upon inspection, Plaintiff asserts the MIST APPROACH was: "grounded on rocky riprap" and "chafing against the piling of [the dock]"; "had sustained hull, rail, and engine damage; and was surrounded by debris that was itself chafing against the boat." (Id.) Plaintiff did not observe and was never aware of anyone tending to the vessel. (Id. at p. 7.)

The salvage operation to extricate the MIST APPROACH from its temporary resting place was no easy task. "It took [Plaintiff] with a crew of four individuals roughly 40 man-hours over the course of a full day's work to remove the vessel from its perilous condition and deliver it to safe storage." (Id. at p. 8.) In this process, Plaintiff utilized a 130-foot barge, a 35-ton crane, a push boat, a work skiff, tackle gear and slings, a truck with an attached trailer, and other equipment. (Id.) To retrieve the MIST APPROACH, Plaintiff had to cut away rock debris, rig the vessel to the crane, and use the crane to lift the vessel from its debris-laden position. (Id.) Once Plaintiff lifted the MIST APPROACH by crane, it placed the vessel in the Wilmington River and towed it by boat to a nearby ramp, where it was then put on a trailer and transported to a storage facility for safekeeping. (Id.) Plaintiff's salvage of the MIST APPROACH was successful, and no additional damage was inflicted during the process.[5] (Id.) Based on the amount of time, resources, and labor expended by Plaintiff—and in consideration of the vessel's estimated repair cost (ranging from $36,546 to $38,696) as well as its estimated post-casualty value (ranging from $30,000 to $35,000)—Plaintiff invoiced Defendant in the amount of $7,144.00 for the salvage services. (Id.)

_____

not yet been properly registered. (Doc. 16, p. 7.) Plaintiff also contacted SeaTow in its effort to identify the owner, but the MIST APPROACH was not in the SeaTow database. (Id.)

[5] For extensive photographs of Plaintiff's salvage operation and the state of the MIST APPROACH on the day of the salvage, see Document Number 16-4 at pages ten through ninety-one.

From Defendant's perspective, however, Plaintiff's services were unwanted and the vessel's removal unnecessary. (Doc. 23, p. 4.) In fact, when Mr. Birthisel became aware the MIST APPROACH had been moved, he reported it missing to the Chatham County Marine Patrol. (Id. at p. 5.) As a result, Mr. Rodgers was arrested and charged with felony theft by taking, but that charge was dismissed and disposed of on August 27, 2019, by an order of *nolle prosequi*.[6] When Defendant eventually learned that Plaintiff's aim was to conduct a lawful salvage of the MIST APPROACH, she refused to pay for the invoiced services. (Doc. 16, p. 9.)

Plaintiff and Defendant attempted to settle the matter but quickly became mired in contentious negotiations that failed. (See id. at pp. 9–11; doc. 23, pp. 14–17.) On June 19, 2018, Plaintiff JSM Marine LLC filed the instant Complaint in Admiralty seeking recovery of a salvage award in the amount of $7,144.00. (Doc. 1.) After a less than amicable discovery period, (see, e.g., docs. 31, 36, 39), the case is now before the Court on Plaintiff's Motion for Summary Judgment and Attorney's Fees, (doc. 16), and Defendant's counter Motion for Attorney's Fees, (doc. 31).

## STANDARD OF REVIEW

Summary judgment "shall" be granted if "the movant shows that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" if it "might affect the outcome of the suit under the governing law." FindWhat Inv'r Grp. v. FindWhat.com, 658 F.3d 1282, 1307 (11th Cir. 2011) (quoting

---

[6] See Chatham County Court Case Search System, *available at* https://cmsportal.chathamcounty.org/portal (click on "Smart Search" icon; then search for SPCR18-00531-J3 (Superior Court Proceedings) and N161166 (Magistrate Court Proceedings) or "Rodgers, Karl Robin") (last visited Sept. 3, 2019). Because Defendant's husband contacted the Chatham County Marine Patrol, Plaintiff ultimately returned the MIST APPROACH to law enforcement rather than to Defendant. (Doc. 16, p. 8 n.3.)

Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)).  A dispute is "genuine" if the "evidence is such that a reasonable jury could return a verdict for the nonmoving party." Id.

The moving party bears the burden of establishing that there is no genuine dispute as to any material fact and that it is entitled to judgment as a matter of law. See Williamson Oil Co. v. Philip Morris USA, 346 F.3d 1287, 1298 (11th Cir. 2003).  Specifically, the moving party must identify the portions of the record which establish that there are no "genuine dispute[s] as to any material fact and the movant is entitled to judgment as a matter of law." Moton v. Cowart, 631 F.3d 1337, 1341 (11th Cir. 2011).  When the nonmoving party would have the burden of proof at trial, the moving party may discharge his burden by showing that the record lacks evidence to support the nonmoving party's case or that the nonmoving party would be unable to prove his case at trial. See id. (citing Celotex Corp. v. Catrett, 477 U.S. 317, 322–23 (1986)).  If the moving party discharges this burden, the burden shifts to the nonmovant to go beyond the pleadings and present affirmative evidence to show that a genuine issue of fact does exist. Anderson, 477 U.S. at 257.

In determining whether a summary judgment motion should be granted, a court must view the record and all reasonable inferences that can be drawn from the record in a light most favorable to the nonmoving party. Peek-A-Boo Lounge of Bradenton, Inc. v. Manatee County, 630 F.3d 1346, 1353 (11th Cir. 2011) (citing Rodriguez v. Sec'y for Dep't of Corr., 508 F.3d 611, 616 (11th Cir. 2007)).  However, "facts must be viewed in the light most favorable to the non-moving party only if there is a 'genuine' dispute as to those facts." Scott v. Harris, 550 U.S. 372, 380 (2007).  "[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." Id. (emphasis and citation omitted).

## DISCUSSION

Since time immemorial, and as far back as the colonial era in American jurisprudence, marine salvage has "recognized the principle of offering a reward for the saving of imperiled maritime property." 3A Benedict on Admiralty § 1 (7th ed. 2019). This venerable principle of law is centrally concerned with "the preservation of property on oceans and waterways." Columbus-America Discovery Grp. v. Atl. Mut. Ins. Co., 974 F.2d 450, 460 (4th Cir. 1992) (citation omitted). The law of salvage compensates those who voluntarily endeavor to protect maritime property "as a matter of public policy to encourage seamen to render aid in emergency situations." Cape Ann Towing v. M/Y "Universal Lady", 268 F. App'x 901, 902 n.1 (11th Cir. 2008) (per curiam) (citation omitted). Uniquely a part of maritime and admiralty law, an award of salvage is not merely one of *quantum merit* for services rendered; rather, salvage provides the successful salvor a bounty to encourage the preservation of life and property imperiled by the sea and to foster maritime commerce. See The Blackwall, 77 U.S. 1, 12, 14 (1869); see also Mason v. Ship Blaireau, 6 U.S. 240, 266 (1804) (describing maritime salvage law as a "liberal and enlarged" compensatory system).

The longstanding elements of a salvage award claim were articulated by the Supreme Court of the United States more than a century ago in The Sabine, 101 U.S. 348 (1879). As recently reaffirmed by the Eleventh Circuit Court of Appeals, "the Supreme Court held that '[t]hree elements are necessary to a valid salvage claim: 1. A marine peril. 2. Service voluntarily rendered when not required as an existing duty or from a special contract. 3. Success in whole or in part, or that the service rendered contributed to such success.'" Girard v. M/V "BLACKSHEEP", 840 F.3d 1351, 1354 (11th Cir. 2016) (alteration in original) (quoting The Sabine, 101 U.S. at 384)

(citing <u>Legnos v. M/V Olga Jacob</u>, 498 F.2d 666, 669–71 (5th Cir. 1974)).[7]  The Eleventh Circuit reiterated that, as a matter of public policy, salvage law encourages mariners to aid ships in distress. <u>Id.</u>  "Specifically, the law of salvage aims to induce '<u>all</u> to render aid in the face of marine peril' . . . 'and to do so <u>before</u> it is a do-or-die wager with high risks.'"  <u>Id.</u> (emphases in original) (quoting <u>Legnos</u>, 498 F.2d at 671; and <u>Miss. Valley Barge Line Co. v. Indian Towing Co.</u>, 232 F.2d 750, 755 (5th Cir. 1956)).

In this salvage case, there is no dispute that Plaintiff acted voluntarily and successfully when it removed Defendant's vessel from the bank of the Wilmington River.  (<u>See</u> Docs. 16, 23.) Thus, only the first element, whether the MIST APPROACH was in a state of "marine peril" is at issue.  The Court first addresses the "marine peril" issue in the context of Plaintiff's Motion for Summary Judgment before considering the parties' respective requests for attorney's fees.  As set forth below, the Court finds the undisputed facts establish that a "marine peril" existed.  Thus, Plaintiff is due summary judgment on its salvage claim.

## I.    Plaintiff JSM Marine LLC's Motion for Summary Judgment (Doc. 16.)

Plaintiff contends this is a "straight-forward" salvage case because the undisputed facts establish that the MIST APPROACH was "unquestionably in a state of peril."  (Doc. 16, p. 1.) Plaintiff's centrally argues that Defendant's vessel was both stranded and grounded on the river bank and that situation is a *per se* state of marine peril under applicable case law.  (<u>Id.</u> at pp. 13–18.)  In particular, Plaintiff avers the MIST APPROACH "was grounded on rock, without power, and incapable of removing itself from its predicament.  It had sustained damage, likely was continuing to sustain damage, and was surrounded by elements (rock, debris, and the pier, for

---

[7]  In <u>Bonner v. City of Prichard</u>, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc), the Eleventh Circuit Court of Appeals adopted as binding precedent all decisions of the former Fifth Circuit handed down prior to October 1, 1981.

example) that threatened future harm." (<u>Id.</u> at p. 17.)  Plaintiff argues, moreover, that Defendant admitted the MIST APPROACH was incapable of removing itself from the hurricane-debris strewn bank, thereby establishing the "marine peril" element.  (<u>Id.</u> at p. 16 n.9.)  Lastly, Plaintiff contends that, irrespective of whether the MIST APPROACH had been tied to the dock, it faced "at least some marine peril," which is all the law of salvage requires.  (<u>Id.</u> at pp. 17–18.)

In response, Defendant asserts that factual disputes surrounding the MIST APPROACH's condition and location preclude summary judgment.  (Doc. 23, pp. 5, 11–14.)  Specifically, Defendant disputes that the MIST APPROACH was incapable of removing itself from its location next to the dock and disputes that the vessel had actually run aground.  (<u>Id.</u> at pp. 3–4, 9–11.) Defendant submits that the "vessel was not grounded . . . [r]ather, it was sitting on and surrounded by debris from the hurricane." (<u>Id.</u> at p. 2.)  Furthermore, Defendant argues there is no *per se* rule of marine peril with respect to grounding, and she asserts the facts of this case are distinguishable from those cases where courts found grounded vessels to be in marine peril as a matter of law.  (<u>Id.</u> at pp. 9–11.)  In sum, because the MIST APPROACH had been tied to the dock and had been in the same position for ten days, Defendant contends there was no emergency or marine peril upon which to act.  (<u>Id.</u> at pp. 7–8.)  At the very least, Defendant argues these undisputed facts create an issue as to whether Plaintiff had a reasonable apprehension that Defendant's vessel faced marine peril.  (<u>Id.</u> at pp. 12–14.)

In reply, Plaintiff asserts that Defendant's position is contrary to "the great weight of authority establishing that grounding and stranding each constitute *per se* marine perils" and that Defendant fails to provide "even a single case addressing a grounding or a stranding that supports her position in this matter." (Doc. 36, p. 1.)  Thus, Plaintiff argues the MIST APPROACH was under marine peril as a matter of law.  (<u>Id.</u> at pp. 2–6.)  What is more, Plaintiff contends Defendant

has changed its position based on sham declaration testimony: "Defendant, apparently realizing that its previous discovery position that the [MIST APPROACH] was so high up the shore and aground that it was not going anywhere actually establishes marine peril, has sought to reverse this dispositive testimony by apparently arguing both that the vessel could move and that it could not." (Id. at pp. 1–2.) Plaintiff insists the Court should reject this evidence—which concerns the vessel's alleged grounding and inoperable engine—as improperly inconsistent with previously sworn statements and further maintains that, even with this evidence, a marine peril has still been established under the law of salvage. (Id. at pp. 6–19.)

### A.    Whether to Consider Defendant's Challenged Declarations

Defendant attempts to create disputes of material fact by relying on the respective declarations of Mr. Birthisel, (doc. 25), and Mr. Egbert, (doc. 26). Plaintiff argues the Court should exclude certain portions of these declarations as contradictory to prior testimony, documentary evidence, and unwithdrawn admissions, or because they are unsupported by personal knowledge and concern improper expert testimony. (Doc. 36, pp. 10–19.) Defendant did not respond to these arguments or attempt to justify the declarations' inconsistencies in the first instance.

Plaintiff first asks the Court to not consider Mr. Birthisel's averments: that "[t]he vessel was in a marsh area . . . and was not grounded on rocks [or otherwise, instead] the vessel was sitting on top of debris from the hurricane"; and that "the vessel could have been removed from its location under its own power [if the debris were removed] because the engine was still operable." (Doc. 25, pp. 2, 3). Plaintiff contends these statements contradict Defendant's unwithdrawn judicial admission, Mr. Birthisel's deposition testimony, and other evidence of record. (Doc. 36, pp. 11–16.) The Court agrees.

In discovery, Defendant admitted that the MIST APPROACH "was *unable to move under power or maneuver* but denies that it was salvaged." (Doc. 16-3, p. 2 (emphasis added).) Federal Rule of Civil Procedure 36(b) provides that discovery admissions are "conclusively established unless the court, on motion, permits the admission to be withdrawn or amended." Admissions not withdrawn or amended cannot be rebutted by contrary testimony or ignored by the Court. See Williams v. City of Dothan, 818 F.2d 755, 762 (11th Cir. 1987) ("Because Dothan never sought to withdraw or amend its admission, the court was not free to reject this 'conclusively established' fact even if it '[found] more credible the evidence of the party against whom the admissions operate.'" (quoting Brooks Village N. Assocs. v. General Elec. Co., 686 F.2d 66, 73 (1st Cir. 1982)). Consequently, Defendant's clear admission that the MIST APPROACH could not move under power or maneuver and its failure to move to withdraw that admission provide enough reason alone to reject Mr. Birthisel's contradictory declaration. Further, this unwithdrawn admission conclusively establishes that Defendant's vessel was incapable of removing itself from the subject location.

Although not necessary to reject Mr. Birthisel's statements on this point, the Court pauses to briefly compare his contrary deposition testimony because the stark inconsistencies give the Court great concern. When additionally compared to the photographic evidence of record, Mr. Birthisel's declaration that the MIST APPROACH was not grounded and could remove itself is revealed as sham evidence. For example, at his deposition, Mr. Birthisel testified to the following:

> Q.  Looking at that photograph, the next one and the other photographs in that pocket, would you say that those photographs show that that boat is rubbing up against the pylon?
> A.  No, it wasn't rubbing. It wasn't even moving. *It was all the way up, so there was very little water up there at all, if any, because [it] was sitting on a bunch of trash and stuff.* Well, you can see some of it right there. I mean, that's—there was some water over there, but not over here where the boat was sitting. That's why I wasn't worried about it, *because I knew it wasn't going anywhere.*

(Doc. 27, p. 12 (emphasis added).)

> Q. So it's your testimony that based on how much water is under the boat in those pictures that you don't think that boat could have moved at all?
> A. Oh, no. *I knew it couldn't. I knew we were going to have to somehow get somebody to lift it out of there because it was sitting on top of too much stuff.*
> …
> A. *The way our boat was sitting I didn't see it going anywhere, moving or anything.* You know, if it was half in the water or half on sandy beach that would be a little bit different, but that was sitting on so much wood and stuff underneath it that it wasn't—it wasn't going to move anyway.

(Id. at pp. 13, 42 (emphasis added).)

The inconsistencies regarding the MIST APPROACH's maneuverability could not be more obvious. In one breath Mr. Birthisel states the vessel could not have moved at all, and that it "was all the way up" sitting on debris and away from water such that "it wasn't going anywhere" without getting "somebody to lift it out," (id. at pp. 12–13), but in the next he states that the vessel, "could have been removed from its location under its own because the engine was still operable," (doc. 25, p. 3). A court may "disregard an affidavit as a matter of law when, without explanation, it flatly contradicts [the affiant's] own prior deposition testimony for the transparent purpose of creating a genuine issue of fact where none existed previously." Furcron v. Mail Ctrs. Plus, LLC, 843 F.3d 1295, 1306 (11th Cir. 2016) (citations omitted). The Court does so here.

Furthermore, Mr. Birthisel's declaration that the MIST APPROACH "was not grounded on rocks" and that he does "not believe [it] was grounded," (doc. 25, p. 2), is incompatible with the photographic evidence adduced by both parties in this case. When Plaintiff arrived to salvage the MIST APPROACH its bow had clearly run aground and was partly resting on rocky riprap:

 

(Doc. 16-4, pp. 11, 21.)

Prior to this point, when Defendant's insurer Mr. Egbert came to inspect the vessel and the water was at a lower tide, the MIST APPROACH had run aground on both the river bank and the debris-covered bed:





(Doc. 16-5, pp. 4, 6.)

It strains credulity to claim the vessel was not on rocks when the photographs unquestionably show the bow resting on rocky riprap and the river-bank ground. Moreover, as evidenced by photographs depicting Plaintiff's employees standing and working on the subject debris at a higher tide, (doc. 16-4, pp. 64, 66, 69, 71, 74), the debris itself was on firm ground. Thus, even if the debris was removed, the boat would have been on that same firm ground. Meaning the MIST APPROACH, sitting atop this debris, was grounded or had run "aground" in the maritime sense of those words. See 8 Benedict on Admiralty, Nautical Glossary (7th ed. 2019) (defining "aground" as "[w]holly or partially resting on the bottom"); Ashore, Black's Law Dictionary (11th ed. 2019) (equating "ashore" with "aground" and defining the word relative to ships as "having the bottom on the ground and therefore stranded").[8] Given that this debris could support the vessel and people without it or them falling into the shallow water below, and that the vessel could admittedly not move, it is clear that the MIST APPROACH had run aground on and become stranded and that Mr. Birthel's declaration to the contrary is sham evidence.[9] The amount of water present there, even at high tide, was not sufficient to bring the MIST APPROACH afloat,[10] and thus, it is only reasonable to conclude that Defendant's vessel was grounded on both

---

[8]    See also Aground, Cambridge Dictionary, https://dictionary.cambridge.org/us/dictionary/english/aground (defining "aground" as "touching the ground below the water" or a boat being "unable to move because it is touching ground or in a place where there is very little water") (last visited Sept. 3, 2019); Aground, Google Dictionary, https://www.google.com (search "aground definition") (defining "aground" relative to ships as "lying on or touching the ground under shallow water" or as being "on or on to the ground under shallow water," and noting "aground" is synonymous with "ashore" and "grounded") (last visited Sept. 3, 2019).

[9]    In addition, the Court discerns no authority, logic, or principled reason to distinguish between a vessel being "grounded" on actual terra firma and being "grounded" on rocks or other similar hazardous conditions, such as hurricane debris. See 3A Benedict on Admiralty § 19 (7th ed. 2019) ("A ship usually finds herself in that situation [of being stranded] by grounding in shoal waters, sand, bar, reefs or rocks, and, in general, going wherever a vessel shouldn't.").

[10]    Although the photographs make this point plain, Mr. Birthisel stated as much in his deposition: The water was "[m]aybe [underneath] the middle of the boat. It wouldn't be three quarters, maybe a quarter about. It wasn't moving the boat. It wasn't lifting the boat up. . . . I knew [the water] couldn't [move the

the river bank and hurricane debris. For all of these reasons, the Court disregards Mr. Birthisel's declaration to the contrary.

Second, Plaintiff asks the Court to disregard Mr. Birthisel's averment that the vessel's "engine was still operable" and "did not sustain any damage" other than to its casing, (doc. 25, pp. 2–3). (Doc. 36, p. 17.) To begin, this statement is inconsistent with Defendant's judicial admission that her vessel "was unable to move under power or maneuver." (Doc. 16-3, p. 2.) Further, at his deposition, Mr. Birthisel testified that "we replaced the engine rather than go through all the wire and harness and all that stuff." (Doc. 27, p. 37.) Repair estimates show that the cost of making these engine repairs, which included replacing the main and ignition wiring harnesses among other parts, would have exceeded $3,000.00. (See Doc. 16-7, pp. 2, 6.) This evidence establishes that the MIST APPROACH's engine was not operable at the time of salvage. Other than Mr. Birthisel's declaration, there is simply nothing in the record that contradicts that evidence. Even Mr. Birthisel fails to provide any corroborating detail, such as a statement that he tested the engine or that it functioned in a specific instance post-hurricane. Thus, because Mr. Birthisel's engine declaration is inconsistent with his deposition testimony as well as the repair records and Defendant's admission, the Court disregards it.

Lastly, Plaintiff asks the Court to disregard both Mr. Birthisel's and Mr. Egbert's statements that any damage sustained by the MIST APPROACH was caused by the hurricane instead of the nearby dock and debris, (doc. 25, pp. 2–3; doc. 26, p. 2). (Doc. 36, pp. 17–19.) Although it is patently true that neither Mr. Birthisel nor Mr. Egbert have any personal knowledge of how the MIST APPROACH became damaged—neither of them were witnesses to Hurricane Matthew's destruction along the Wilmington River—the Court finds these averments regarding

---

boat]. I knew we were going to have to somehow get somebody to lift it out of there because it was sitting on top of too much stuff." (Doc. 27, p. 13.)

the cause of the vessel's damage largely irrelevant to the issue of marine peril presented by this case. "To determine whether a maritime peril existed, the Court examines whether, at the time the assistance was rendered, the ship was in a situation that might expose her to loss or destruction." Klenner v. M/Y EL PRESIDENTE, No. 11-60642-CIV, 2012 WL 3150050, at *11 (S.D. Fla. Aug. 1, 2012) (citation and internal quotations omitted). Therefore, the precise cause of the MIST APPROACH's damage, whether it be the hurricane or the vessel's resting place, largely is of no moment because the issue of marine peril turns on the MIST APPROACH's situation *when Plaintiff rendered salvage services*. Moreover, even if the hurricane caused the past damage to the MIST APPROACH, that does not negate the potential for future damage to the vessel. Accordingly, these causation disputes, which concern events that precede Plaintiff's actions, are of no moment.

In sum, to the extent Mr. Birthisel's declaration contradicts judicial admissions or the evidence of record, the Court declines to consider it. As such, Defendant's reliance on these statements will not suffice to create factual disputes or otherwise preclude summary judgment.

### B.      Whether the MIST APPROACH was in "Marine Peril"

In deciding whether a vessel was in marine peril, the Court looks to the vessel's situation "at the time the assistance was rendered." Id. This "determination must be made in light of the circumstances as they appeared at the time of the [salvage] and not from hindsight." In re City of N.Y., 534 F. Supp. 2d 370, 377 (E.D.N.Y. 2008) (citation omitted). The marine peril "danger need not be immediate or actual. All that is necessary is a reasonable apprehension of peril." M/Y EL PRESIDENTE, 2012 WL 3150050, at *11 (citing Fort Myers Shell and Dredging Co. v. Barge NBC, 404 F.2d 137, 139 (5th Cir. 1968)). It is enough that, when salvage services are rendered, "the vessel has encountered any damage or misfortune which might possibly expose her to

destruction if the services were not rendered." <u>Cayere v. Malta Mediterranean Shipping Co.</u>, No. CIV. 12-1122 GAG/SCC, 2012 WL 3112330, at \*2 (D.P.R. Apr. 4, 2012) (quoting <u>Clifford v. M/V Islander</u>, 751 F.2d 1, 5–6 (1st Cir. 1984)). "The degree of peril—whether slight or serious—can affect the amount of the award, but not the establishment of salvage service." 3A Benedict on Admiralty § 63 (7th ed. 2019). A "marine peril" determination is within the district court's sound discretion, subject to clearly erroneous review. <u>See Flagship Marine Servs. v. Belcher Towing Co.</u>, 966 F.2d 602, 605 n.3 (11th Cir. 1992).

As is relevant here, most courts consider a vessel's "hard grounding [to be] *per se* marine peril." <u>Cayere</u>, 2012 WL 3112330, at \*2 (collecting cases).[11] "A vessel driven aground, on rocks, shoals, or reefs is a classic example of a ship in maritime peril." <u>Fine v. Rockwood</u>, 895 F. Supp. 306, 309 (S.D. Fla. 1995). "It is idle to argue that a ship aground in shallow water on a sea beach, exposed to wind and wave in the hurricane season, is in a safe place." <u>De Aldamiz v. Th. Skogland & Sons</u>, 17 F.2d 873, 874 (5th Cir. 1927). A vessel that is stranded on some "impedimentary form and requiring pulling power to get her off receives a salvage service and not simple towage." 3A Benedict on Admiralty § 192 (7th ed. 2019). If a vessel has been "driven ashore" and is "unnavigable," then voluntarily provided service that results in the vessel's "consequent ultimate safety or recovery . . . is a salvage service." <u>Id.</u> at § 63; <u>see also id.</u> at § 19 ("Aiding a stranded vessel . . . by extricating or relieving it from that position is a salvage service.") Further, a vessel's loss of its capacity to maneuver, either by engine failure or otherwise, generally constitutes marine peril. <u>See Klein v. Unidentified Wrecked & Abandoned Sailing Vessel</u>, 758 F.2d 1511, 1515 (11th Cir. 1985) (maritime peril shown where the vessel "could not have been rescued without the

---

[11] A vessel is said to be "hard aground" when it "has gone aground and is incapable of refloating under her own power." <u>Glossary of Shipping Terms</u>, Alliance, https://www.allianceshippinggroup.co.uk/tools/glossary-of-shipping-terms/ (last visited Sept. 3, 2019).

salvor's assistance"); 3A Benedict on Admiralty § 64 (7th ed. 2019) ("Mechanical difficulties, machinery breakdowns, damages or losses of rudders or propellers will generally imperil a ship to a greater or lesser degree.").[12]  With these general principles in mind, the Court now examines the particular facts of this case.

Based on the undisputed facts established here, Defendant's argument that the MIST APPROACH was not in marine peril rests on the following: the vessel was tied to the dock and was being checked on; the vessel had remained in that same position for approximately ten days without incurring additional, discernable damage; the vessel was not leaking fuel or lubricant; and it was located in a residential area of the river away from the perils of the open sea.  (See Doc. 16, pp. 2–4, 9–10.)  For these reasons, Defendant asserts there was no emergency, or reasonable apprehension of peril, from which to save the MIST APPROACH.  (See id.)  However, this description omits key facts surrounding the vessel's predicament and paints a far more favorable picture than the undisputed evidence establishes.  Further, as established by the authorities discussed above, a grounded ship that cannot free itself from its predicament is stranded and generally faces marine peril.  "[W]hen a vessel is stranded she and her cargo are practically always in a substantial peril.  Such a vessel is helpless because she cannot pursue her intended voyage or deal effectively with any emergency which may arise."  Navigazione General Italiana v. Spencer Kellogg & Sons, 92 F.2d 41, 44 (2d Cir. 1937).

---

[12]  The court in Klein construed the "marine peril" element to *require* salvage claimants to show that the vessel "could not have been rescued without the salvor's assistance."  758 F.2d at 1515.  Recently, however, the Eleventh Circuit determined that this added requirement is no longer good law.  In M/V "BLACKSHEEP", the Eleventh Circuit held that Klein's addition to the "marine peril" showing "is inconsistent with both Supreme Court precedent and binding circuit precedent," and the court expressly discarded it.  840 F.3d at 1355 & n.2.  In doing so, the M/V "BLACKSHEEP" Court found that the requirement "undercuts the policy interests" of salvage law by too narrowly limiting the ability of prospective salvors to recover an award.  Id. at 1354–55.  Based on this rationale, a vessel's being in a situation where it can not be rescued without the assistance of a salvor remains a strong factor in favor of finding marine peril.

Here, the MIST APPROACH was grounded upon both hurricane debris and the rocky bank of the Wilmington River, a position which left it stranded because it could not "move under power or maneuver." (Doc. 16-2, p. 2.) As Defendant states, "[t]he vessel was basically immobilized due to the debris" and required "someone to tow [it] from the location." (Doc. 23, pp. 3–4.) It is undisputed that, to free the MIST APPROACH from its grounding, Plaintiff had to lift it with a crane and then tow it away. (Doc. 16-4, pp. 23–28.) Although the MIST APPROACH had been secured to the dock and had arguably suffered no additional damage since its grounding, the vessel remained in a situation where it "could not have been rescued without [] assistance." Klein, 758 F.2d at 1515. The undisputed fact remains that the MIST APPROACH was stranded atop hurricane debris and rocky riprap, unable to free itself without the assistance of a salvor.[13]

Moreover, because an actual stranding is inherently fraught with peril, "salvage awards have been granted even where the vessel could safely have remained grounded for an indefinite period of time." Markakis v. S/S Volendam, 486 F. Supp. 1103, 1107 (S.D.N.Y. 1980); see The St. Paul, 86 F. 340, 343 (2d Cir. 1898) (affirming salvage award for ship that had been stranded on a beach for eleven days, even though it "might have remained there in safety for an indefinite time," because the stranding exposed the ship to further "deterioration" and prevented it from serving its "purpose" as an ocean liner). Notwithstanding any damage or peril caused by the grounding in the first instance, a stranded vessel necessarily remains susceptible to the ever-changing costal elements, thereby placing it in a reasonable apprehension of further marine peril. See Atl. Towing Co. v. The Caliche, 47 F. Supp. 610, 614–15 (S.D. Ga. 1942) (determining that removal of tanker from a three-day strand "was a salvage service" and that the peril came from the stranding "on dangerous shoals" and the dangers inherent in stranding itself and those particular

---

[13] Indeed, Defendant had planned to hire a marine towing company to retrieve the vessel at some point. (See Doc. 16, p. 3.)

to the South Atlantic coast). This is even more the case here, where the MIST APPROACH was stranded in a precarious situation rather than simply on a beach.

Against the well-recognized salvage law discussed herein, Defendant fails to offer a single case holding that a vessel which is grounded upon dangerous objects and which is incapable of dislodging itself under its own power was nevertheless found to be free from marine peril. Defendant refers to several cases where courts found that a marine peril did not exist, but simply, none of those cases involve a grounded and stranded vessel, (doc. 23, pp. 7–8). See M/V Islander, 751 F.2d 1, 7 (1st Cir. 1984) (ship neither grounded nor stranded); Lay v. Hixson, 905 F. Supp. 2d 1256, 1260 (S.D. Ala. 2012) (same); Phelan v. Minges, 170 F. Supp. 826, 828 (D. Mass. 1959) (same). At best, Defendant refers to Fine, 895 F. Supp at 310 and Neptune Maritime Co. of Monrovia v. Vessel ESSI CAMILLA, 562 F. Supp. 14, 24–25 (E.D. Va. 1982), but these cases are also materially distinguishable from the facts and issues here.

In Fine, the court's contra marine peril finding rested on the now discarded Kline requirement that a successful salvor must have acted "in a situation of maritime peril from which [the vessel] could not have been rescued without [the salvor's] help." 895 F. Supp. at 310. Moreover, there the vessel was resting on the bottom of a channel rather than on jagged hurricane debris and rocky riprap. See id. Further, it is undisputed that the MIST APPROACH required assistance to be dislodged from its grounding. In Neptune, the court's contra marine peril finding did not concern the salvage of a grounded and stranded vessel; instead, the court found no marine peril where a temporary grounding prevented two collided ships from "drifting further out of control and incurring further damage" and where the ships later went on their own way. See 562 F. Supp at 20, 24–25. These cases thus fail to support the notion that a vessel which has run aground, in a situation where it is stranded and unable to free itself, does not face marine peril.

The undisputed facts of this case establish just such a situation, and under the law of admiralty and maritime salvage, the Court finds that the MIST APPROACH was in marine peril at the time of Plaintiff's salvage.  To rehash, Plaintiff arrived on the scene to find the MIST APPROACH aground on the bank of the Wilmington River, sitting atop rocks and extensive amounts of perilous hurricane debris.  In its situation, the MIST APPROACH was stranded because it was incapable of extricating itself from its predicament.  While the MIST APPROACH arguably had not sustained any additional damage following Hurricane Matthew and was tied to a dock, without the assistance of Plaintiff, the MIST APPROACH remained exposed to the elements during hurricane season and the additional peril posed thereby.  Defendant both judicially admitted and provided extensive testimonial evidence that the MIST APPROACH required assistance in order to become dislodged from its grounding.  There is nothing before the Court to suggest Defendant could have somehow floated the MIST APPROACH to safety.  Lying helpless along the bank of the Wilmington River, grounded atop hurricane debris with its bow lodged along the rocky riprap, Defendant's vessel was plainly in a state of marine peril.

Because the MIST APPROACH was grounded and stranded in this manner, the Court concludes as a matter of law that Plaintiff has established the existence of a marine peril.

### C.      The Salvage Award

The amount of a salvage award "is largely a matter of fact and discretion, which cannot be reduced to precise rules, but depends upon a consideration of all the circumstances of each case." The Connemara, 108 U.S. 352, 359 (1883).  In calculating an award of salvage, courts consider the long-standing factors established by the Supreme Court in The Blackwall.  These factors, which account for the salvor's skill, effort, and risk undertaken, are:

(1) The labor expended by the salvors in rendering the salvage service.
(2) The promptitude, skill and energy displayed in rendering the service and saving the property.
(3) The value of the property employed by the salvors in rendering the service and the danger to which such property was exposed.
(4) The risk incurred by the salvors in securing the property from the impending peril.
(5) The value of the property saved.
(6) The degree of danger from which the property was rescued.

Girard v. M/Y Quality Time, 596 F. App'x 846, 847 (11th Cir. 2015) (per curiam) (quoting The Blackwall, 77 U.S. at 14). "Consistent with . . . the economic principles underlying the law of salvage, the only hard numerical limitation [courts have] ever placed on salvage awards is the full value of the salved property." Margate Shipping Co. v. M/V J.A. Orgeron, 143 F.3d 976, 993 (5th Cir. 1998) (citation omitted).

Plaintiff seeks an award of $7,144.00 for its salvage of the MIST APPROACH. (Doc. 16, pp. 20–21; doc. 16-1, pp. 3–4; see also doc. 1, p. 3.) Defendant does not challenge the basis of the amount of Plaintiff's salvage award request. (See Doc. 23, 24.) Thus, the facts regarding the salvage award calculation set forth by Plaintiff in its required fact statement, (doc. 16-1, pp. 3–4), are deemed admitted. Local R. 56.1 The Court nonetheless appraises Plaintiff's request in light of these admitted facts and the applicable factors.

### (1) Labor Expended

The Court finds that Plaintiff and its crew of four employees expended approximately forty (40) total hours of labor, over the course of a full day's work, to salvage the MIST APPROACH. (Doc. 16-1, p. 3.) This includes the time it took remove the vessel from its grounding, tow it to a nearby boat ramp, and then deliver it to safe storage. (Id.) Moreover, the labor expended here involved the use of skilled employees capable of operating a crane and other heavy equipment.

### (2)     The Promptitude, Skill, and Energy Displayed

The Court finds that while Plaintiff was not prompt in its service—having waited some ten days to return to the MIST APPROACH for salvage after first finding it in peril—it was skillful. The salvage of the MIST APPROACH required the use of a 130-foot barge and a 35-ton crane, among other equipment.  (Id.)  Plaintiff's crew, while working atop extensive hurricane debris, had to, among other things, rig the vessel to a crane to lift it from its grounding, before marine towing and then transporting the vessel to safe storage.  (Id.; see doc. 16-4, pp. 10–91.)  To do so in a successful manner required skill, expertise, and energy, which Plaintiff clearly displayed.

### (3)     The Value of the Property Employed in Rendering Service and the Danger to Which it Was Exposed

In total, Plaintiff utilized the following equipment: "a 130-foot barge, a 35-ton crane, a push boat, a work skiff, a truck and trailer, tackle, slings, and other [various] gear."  (Doc. 16-1, p. 3.)  There is no evidence regarding the specific value of this equipment, but it is clearly worth a considerable sum.  Nonetheless, given the normal weather and river conditions in which the salvage took place, there was minimal danger posed to Plaintiff's property.

### (4)     The Risk Incurred by the Salvors

The risks incurred by Plaintiff were low.  While the use of a crane to lift a vessel certainly carries with it some inherent risk, the conditions faced by the salvors did not pose any particular danger.  The weather was agreeable and the grounded MIST APPROACH sat motionless, allowing it to be lifted out by the crane in a normal course of fashion.  (See id. at pp. 3–4.)

### (5)     The Value of the Property Saved

Plaintiff states the value of the MIST APPROACH post-casualty was approximately $30,000 to $35,000.[14]  (Id.)  Plaintiff arrived at this number based on advertisements selling the

---

[14] Defendant originally purchased the vessel used, in a private sale at a cost between $43,000 and $45,000.

same or similar boat and Mr. Rodgers' general knowledge of the boat market. (Id.) However, this valuation is not dispositive. The cost to repair the MIST APPROACH was estimated to be between $36,546 to $38,696, (doc. 16-7, pp. 2–3), and Defendant did have it repaired, (doc. 27, p. 37.) At his deposition, Mr. Birthisel testified that insurance totaled the MIST APPROACH and paid out approximately $28,000 to Defendant. (Id. at p. 33.) Defendant then bought the vessel back for between $10,000 and $12,000. (Id.) After repurchasing, Defendant had it repaired at a cost close in number to the repair estimates. (Id. at pp. 33–35.) "Insured value is not definitive, but is at least some evidence of fair market value." Boat Raising & Reclamation v. Victory, No. 2:06CV78-FTM29DNF, 2007 WL 4462995, at *10 (M.D. Fla. Dec. 14, 2007) (citing Commercial Union Ins. v. M/V Bill Andrews, 624 F.2d 643, 649 (5th Cir.1980)). While this evidence does not give a definitive valuation of the MIST APPROACH, it is at least suggestive that Plaintiff's range—$30,000 to $35,000—is within reason. Defendant's insurance company valued the vessel at $28,000 in totaling it. Defendant then spent at least $40,000 to reacquire and repair the MIST APPROACH to working order. Considering all of this evidence and Defendant's admission of Plaintiff's facts in this regard, the Court finds that the fair market value of the MIST APPROACH at the time of salvage was $32,500.

### (6) The Degree of Danger the Property Faced

Although the vessel was in peril, the relative degree of imminent danger was not great. The MIST APPROACH was stranded on a river bank in a residential area and was salved after the hurricane had passed. While the MIST APPROACH was in grave danger when the hurricane ripped it from Defendant's boat lift and grounded it four houses down and while it faced prospective danger in the future, the danger it faced at the time salvage occurred was considerably less. It was immobilized and subject to the elements, but it was otherwise not facing any imminent

notable dangers when Plaintiff salvaged it. Indeed, the MIST APPROACH had arguably not sustained any appreciable additional damage in the several intervening days following Hurricane Matthew.

In the case at bar, it is undisputed that Plaintiff successfully salvaged Defendant's vessel. Given that Plaintiff is a professional salvage company, it is unsurprising that it was able to safely and effectively employ heavy machinery to rescue the MIST APPROACH from being stranded and grounded along the hurricane-strewn bank of the Wilmington River. Under the policy of admiralty law, it is well recognized that professional salvors who successfully complete their services are "entitled to an incentive bonus." New Bedford Marine Rescue v. Cape Jeweler's, 240 F. Supp. 2d 101, 119 (D. Mass. 2003) (citations omitted). Plaintiff invoiced Defendant in the amount of $7,144.00 for such service. (Doc. 16-4, p. 93.) The invoice specifies the following reasonable charges: $6,000 for the salvage; $500 for two hours of boat towing; $300 for trailer transport; $180 for five days of storage; $14 for hoisting at the marina; and $150 for administrative fees. (Id.) Additionally, the Court notes that the range of salvage awards as a percentage of the salved property's value have varied from 4% to 25%. Margate Shipping Co., 143 F.3d 976, 994–95 (5th Cir. 1998). Plaintiff's award request of $7,144.00 represents 22% of the Court's $32,500 valuation of the MIST APPROACH, which falls within the recognized range.

After careful consideration of all the factors involved in calculation a salvage award and the particular facts of this case, the Court concludes that Plaintiff is due its requested award of $7,144.00. This amount adequately accounts for the nature of Plaintiff's labor and salvage efforts as well as its professional expertise while also acknowledging the condition of and danger faced by the MIST APPROACH at the time of salvage.

### D. Conclusion as to Summary Judgment on Plaintiff's Salvage Claim

As found above, the undisputed facts of this case demonstrate that Defendant's vessel was in marine peril when Plaintiff salvaged it. Further, there is no dispute that Plaintiff voluntarily and successfully salvaged the MIST APPROACH. Therefore, Plaintiff has established a valid salvage claim, the award for which is $7,144.00. Accordingly, the Court **GRANTS** Plaintiff's Motion for Summary Judgment on its salvage claim. (Doc. 16.)

## II. Attorney's Fees

In the Eleventh Circuit, "'[t]he prevailing party in an admiralty case is not entitled to recover its attorneys' fees as a matter of course.'" Misener Marine Constr., Inc. v. Norfolk Dredging Co., 594 F.3d 832, 838 (11th Cir. 2010) (quoting Natco Ltd. P'ship v. Moran Towing of Fla., Inc., 267 F.3d 1190, 1193 (11th Cir.2001)). There are, however, exceptions to this general proscription against awarding attorney's fees in admiralty cases. "Attorneys' fees will be awarded to the prevailing party in maritime cases if: '(1) they are provided by the statute governing the claim, (2) the nonprevailing party acted in bad faith in the course of the litigation, or (3) there is a contract providing for the indemnification of attorneys' fees.'" Id. (quoting Natco Ltd. P'ship v. Moran Towing of Fla., Inc., 267 F.3d 1190, 1193 (11th Cir. 2001). Absent one of these recognized exceptions, a prevailing party is not entitled to attorney's fees in maritime cases. Id. Nonetheless, the "granting of attorney's fees is discretionary in admiralty actions and in salvage cases specifically." Compania Galeana, S. A. v. The Motor Vessel Caribbean Mara, 565 F.2d 358, 360 (5th Cir. 1978) (citations omitted).

### A. Defendant's Motion for Attorney's Fees (Doc. 31.)

Defendant seeks attorney's fees under the law of admiralty, arguing that Plaintiff brought this litigation in bad faith as a means to establish a defense in the now-dismissed felony theft case

against Mr. Rodgers.  (Doc. 31, pp. 1–2.)  Specifically, Defendant takes issue with Plaintiff's settlement efforts to have Defendant agree to a judgment being rendered against her as part of any settlement agreement.  (Id.)  Defendant also argues Plaintiff engaged in bad faith by mischaracterizing the course of discovery in its summary judgment motion and by ignoring unfavorable case law and evidence in moving for summary judgment.  (Id. at pp. 2–3.)  Plaintiff filed a Response opposing Defendant's Motion and disputing these contentions, (doc. 37), to which Defendant filed a Reply, (doc. 39).

Pretermitting the issues raised here, which are discussed below, the Court's resolution of this case makes Defendant the non-prevailing party.  Consequently, she is unable to recover attorney's fees.  See Misener Marine Constr., Inc., 594 F.3d at 838 (under certain circumstances attorney's fees are "awarded to the *prevailing party* in maritime cases") (emphasis added).  Accordingly, the Court **DENIES** Defendant's Motion for Attorney's Fees.  (Doc. 31.)

### B.      Plaintiff's Motion for Attorney's Fees (Doc. 16.)

In its Motion for Summary Judgment, Plaintiff argues that it is entitled to attorney's fees under both general maritime law and Federal Rule of Civil Procedure 37.  (Doc. 16, pp. 21–23.)  Plaintiff contends attorney's fees should be awarded under maritime and admiralty law because Defendant acted in bad faith by: rejecting attempts to settle the case at a discount; taking positions "entirely unsupported" by relevant case law; seeking to pursue an irrelevant defense premised on Mr. Rodger's now-dismissed theft charge; and engaging in discovery in a manner that caused Plaintiff to incur unnecessary costs.  (Id. at p. 22.)  As to attorney's fees under Rule 37, Plaintiff argues it is entitled to fees based on Defendant's "failure to admit the truth of certain matters that would have greatly narrowed the scope of this case."  (Id.)  Specifically, Plaintiff asserts Defendant denied its request to admit the elements of a salvage claim—as to each element—without

justification or evidence and denied its requests to admit certain "basic facts" relevant to the lawsuit. (Id. at p. 23.)

In response, Defendant argues that Plaintiff mischaracterizes the settlement negotiations because Plaintiff's settlement attempts included the "bizarre" demand that Defendant agree to having a judgment rendered against her. (Doc. 23, pp. 14–15.) Defendant also raises the issue of Mr. Rodger's criminal charge to argue she was not unreasonable in the settlement negotiations. (Id. at p. 15.) As to her failure to admit the salvage elements, Defendant argues she had evidence to not admit those elements and states that "Plaintiff, in fact, stole the vessel." (Id. at p. 15.) Further, she asserts Plaintiff has not established how her denials "expanded these proceedings or caused [Plaintiff] unnecessary trouble and expense." (Id.)

In reply, Plaintiff points to its sham declaration contention, discussed at length above, and maintains that Defendant has refused to acknowledge the validity of its salvage claim based on a position that lacks support in maritime law. (Doc. 36, pp. 19–20.) On the discovery admissions issue, Plaintiff argues that Defendant should have admitted the salvage claim elements because Mr. Birthisel's deposition testimony established the MIST APPROACH was stranded hard aground, and given that Defendant is his wife, she could have admitted these elements without forcing Plaintiff to depose him. (Id. at p. 20.) Moreover, Plaintiff contends that Defendant had no basis to deny: the accuracy of certain photographs of the MIST APPROACH; the voluntariness of its salvage claim; and the successfulness of its salvage claim. (Id. at pp. 21–22.) Plaintiff also asserts Defendant failed to confer when it voiced concern regarding Defendant's responses to its requests to admit. (Id.)

The Court has considered the facts and circumstances of this litigation, including the applicable admiralty case law, and finds that granting Plaintiff's request for attorney's fees is

warranted in light of Defendant's bad faith litigation in this case. (Docs. 1, 16.) In determining the propriety of attorney's fees here, the Court has discretion to consider whether fees should be awarded pursuant to its authority under admiralty and maritime law or under the authority provided by Federal Rule of Civil Procedure 37. See Chambers v. NASCO, Inc., 501 U.S. 32, 46–51 (1991) (courts may award attorney's fees for bad faith under inherent powers even where applicable procedural rules or statutes exist).[15] Given that Plaintiff's allegations of bad faith against Defendant both subsume and extend beyond its contentions for fees under Rule 37, there is no need to "first [] apply" this Rule where it governs before considering the sanctionable conduct that goes beyond its bounds.[16] Id. at 51.

Bad faith exists when the court finds "that a fraud has been practiced upon it, or that the very temple of justice has been defiled." Id. at 46 (citations omitted). Further, a finding of bad faith is warranted where a party or attorney knowingly or recklessly raises a frivolous argument, delays or disrupts the litigation, or hampers enforcement of a court order. Thomas v. Tenneco Packaging Co., 293 F.3d 1306, 1320 (11th Cir. 2002); Malautea v. Suzuki Motor Co., 987 F.2d 1536, 1545 (11th Cir. 1993). In admiralty cases, courts have considered "the necessity for the litigation and the trial upon the issues raised," and have awarded fees where "it was clear that the defendants had little, if any, basis for disputing the salvage award," but brought the case to trial anyway. Southernmost Marine Servs. v. M/V Potential, 250 F. Supp .2d 1367, 1380–81 (S.D. Fla. 2003). Nonetheless, the bad faith inquiry is primarily focused "'on the conduct and motive of a

---

[15] In admiralty cases, a discretionary award of attorney's fees against the non-prevailing party stems from the Court's inherent power under admiralty and maritime law. Noritake Co. v. M/V Hellenic Champion, 627 F.2d 724, 730 n.5 (5th Cir. 1980).

[16] Furthermore, in instances of bad faith, some courts consider the Rule 37 analysis to parallel the analysis under inherent powers. Danis v. USN Commc'ns, Inc., No. 98 C 7482, 2000 WL 1694325, at *30 (N.D. Ill. Oct. 20, 2000)

party, rather than on the validity of the case.'" <u>Esoteric, LLC v. One (1) 2000 Eighty-Five Foot</u> <u>Azimut Motor Yacht Named M/V STAR ONE</u>, 478 F. App'x 639, 643 (11th Cir. 2012) (per curiam) (quoting <u>Rothenberg v. Sec. Mgmt. Co.</u>, 736 F.2d 1470, 1472 (11th Cir.1984)).

Here, the Court finds Defendant acted in bad faith because: she asserted a frivolous defense regarding Mr. Rodger's criminal case; denied certain basic facts without any evidentiary basis; and, most egregiously, relied upon sham declarations in an attempt to defeat summary judgment when it became clear the evidence and law concerning marine peril were decidedly against her. At the outset, basic legal research into the law of salvage and a candid assessment of the facts would have demonstrated that Defendant had very little, if any, basis to credibly dispute the fundamental merits of Plaintiff's salvage claim. <u>See</u> *supra* Discussion Section I.B. As discussed above, in the face of overwhelming authority, Defendant has not cited a single case with analogous facts that supports her defense of Plaintiff's claims. Despite the dearth of authority and facts supporting her position, Defendant stubbornly refused to pay Plaintiff. Plaintiff initially tried to settle the case for the sum of $6,000 with a condition that Defendant either agreeing to a consent judgment against her or altering her discovery responses to admit the MIST APPROACH was salvaged. (Doc. 16-9, p. 3.) In response, Defendant's counsel denied the strength of Plaintiff's case, stating his client "is not the one facing felony criminal charges as a result of this incident." (<u>Id.</u>) Defendant's counsel refused to revisit discovery admissions because doing so would have purportedly made his client "admit to things which are not true." (<u>Id.</u>)

Defendant, however, never established the legal relevancy of Mr. Rodger's criminal charges to the validity of this salvage case. Despite raising it as an issue throughout the litigation, (<u>see</u> Doc. 23, pp. 5, 15–16; doc. 31, pp. 1–3; doc. 39, pp. 1–4; <u>see also</u> doc. 16-10, p. 4), she has provided no case law or other authority indicating that a salvor being charged with theft in relation

to a salvage serves as a defense to the salvage claim or a colorable basis upon which to seek attorney's fees, and the Court has found none. As such, the Court finds Defendant engaged in bad faith by partly relying upon, and litigating, a frivolous defense.

As to the discovery admissions issue, Defendant declined to supplement responses to four of Plaintiff's requests for admission, despite Plaintiff alerting Defendant during litigation that she lacked evidence supporting her denials. (See Doc. 36-1, p. 4; see also doc. 16, pp. 9–10, 22–23.) Plaintiff reiterates here that Defendant improperly denied Requests 4–5, and 13–14. (Doc. 16, pp. 9–10, 22–23; doc. 36, p. 21.) These are:

> 4. Please admit that as a result of Hurricane Matthew the Vessel was in peril.

> 5. Please admit that the photographs attached hereto as Exhibit A accurately depict the state of the Vessel after Hurricane Matthew and prior to the salvage of the Vessel.

> 13. Please admit that Plaintiff was not required by existing duty or special contract to salvage the Vessel.

> 14. Please admit that the Vessel was successfully salvaged.

(Doc. 16-2, p. 3.) Defendant maintained its denial of each of these Requests. (See Doc. 36, p. 22.)

At summary judgment, however, Defendant did not dispute the photographs nor did she dispute the voluntary and successfulness of Plaintiff's salvage. (See Docs. 23, 24.) While Defendant argues that it rightly denied the requests to admit salvage, (doc. 23, p. 15), she has come forth with *no* evidence indicating that the subject photographs, (doc. 16-2, pp. 8–24), were inaccurate, and she has likewise failed to produce any evidence showing Plaintiff's salvage efforts were anything but voluntary and successful. This failure not only contravenes Federal Rules of Civil Procedure 36 and 37, it also constitutes bad faith due to the complete lack of supporting evidence and the sheer litigiousness these denials manifest. "A denial must fairly respond to the substance of the matter; and when good faith requires that a party qualify an answer or deny only

a part of a matter, the answer must specify the part admitted and qualify or deny the rest."  Fed. R. Civ. P. 36(a)(4).  Here, Defendant neither qualified her denials nor admitted any part of Plaintiff's Requests, even though it is undisputed that Plaintiff salvaged the MIST APPROACH of its own accord without incident.

Lastly, and most importantly, Defendant produced and relied upon a declaration containing sham statements designed specifically to defeat summary judgment.  See *supra* Discussion Section I.A.  As discussed at length above, Mr. Birthisel's declaration materially contradicted his earlier deposition testimony on significant points, and it contradicted Defendant's judicial admissions. Defendant, through Mr. Birthisel's testimony, went from acknowledging that the MIST APPROACH required "somebody to lift it out" because "[t]here wasn't any water [] for it to move [and] it was sitting on top of so much crap," (doc. 27, pp. 13, 29), and that damage to the engine required the wiring and harness to be replaced, (id. at p. 37), to claiming that "the vessel could have been removed from its location under its own power because the engine was still operable," (doc. 25, p. 3).  Mr. Birthisel's later sworn statements are also irreconcilable with his earlier testimony that, given the MIST APPROACH's position, it was too far away from the water, even at its highest tide, to float and move, (see doc. 27, pp. 14, 29).  "A nonmoving party many not manufacture a dispute of fact merely to defeat a motion for summary judgment," Doe ex rel. Doe v. Dall. Indep. Sch. Dist., 220 F.3d 380, 386 (5th Cir. 2000) (citations omitted), and the Court finds Defendant's submission of Mr. Birthisel's declaration was an attempt to do just that.  Furthermore, Defendant advanced the frivolous contention that despite the fact that the MIST APPROACH "was sitting on top of debris from the hurricane and had debris surrounding it" and the admission that someone was going to have to "lift" the boat out, the boat was somehow was not "grounded" in this position.  (Doc. 25, p. 2.)  By advancing sham claims such as these, and specifically relying

on them in opposing summary judgment, (doc. 23, pp. 2, 9), Defendant has litigated in bad faith. See, e.g., Kleiman v. Wright, No. 18-CIV-80176, 2019 WL 4023392, at *14 (S.D. Fla. Aug. 27, 2019) (filing false declaration part of pattern of bad faith).

Given that Defendant has advanced frivolous defenses, refused to admit basic facts, and submitted sham evidence on dispositive issues the Court concludes, in its discretion, that Defendant has engaged in bad faith conduct. See For Play Ltd. v. Bow to Stern Maint., Inc., No. 05-22002-CIV, 2006 WL 3662339, at *5 (S.D. Fla. Nov. 6, 2006) (awarding attorney's fees in admiralty case for bad faith where the defendant denied facts that were clearly true, raised defenses without any basis in law or fact, and submitted false testimony on facts crucial to the plaintiff's claims). In light of the evidence adduced in discovery, and shorn of Mr. Birthisel's declaration, "it was clear that [Defendant] had little, if any, basis for disputing the salvage award." Southernmost Marine Servs. v. M/V Potential, 250 F.Supp.2d 1367, 1380–81. Defendant's remaining arguments against marine peril were not well-founded, to the point of being frivolous, given her admissions that the MIST APPROACH was in such a position and state to require the assistance of another to free itself. See Reliable Salvage & Towing, Inc. v. Bivona, 476 F. App'x 852, 854 (11th Cir. 2012) (per curiam) (upholding attorney's fee award in salvage case because, inter alia, the defendant's arguments against marine peril—that the vessel was not taking on water or facing inclement weather—were frivolous under applicable case law). As in Reliable Salvage & Towing, when scrutinized under the line of admiralty and maritime cases concluding that vessels stranded hard aground are in marine peril, Defendant's arguments against marine peril do not hold water.[17]

---

[17] Moreover, as in Reliable Salvage & Towing, "this is not a case where a vessel owner refused to pay the exorbitant and unjustified demand of a salvor and was forced to go to trial" over the amount demanded. 476 F. App'x at 855. Defendant has never argued that the sum invoiced by Plaintiff was excessive, and in

Defendant engaged in bad faith conduct in her defense of this matter. Accordingly, the Court **GRANTS** Plaintiff's Motion for Summary Judgment on its claim for attorney's fees. (Doc. 16.) However, before awarding attorney's fees, the Court must determine the extent to which fees should be awarded and the amount. Thus, the Court **ORDERS** Plaintiff to respond within **twenty-one (21) days** from the date of this Order with additional evidence regarding the amount of attorney's fees requested and the scope of the attorney's fee reward, Local R. 54.2, and **ORDERS** Defendant to respond within **twenty-one (21) days** from Plaintiff's filing with any opposition.

## CONCLUSION

In light of the foregoing, the Court **GRANTS** Plaintiff's Motion for Summary Judgment and Attorney's Fees, (doc. 16), and **DENIES** Defendant's Motion for Attorney's Fees, (doc. 31). The Court **DIRECTS** the Clerk of Court to enter judgment in favor of Plaintiff in the amount of $7,144.00. The Court **ORDERS** Plaintiff to respond within **twenty-one (21) days** from the date of this Order with additional evidence regarding the amount and scope of attorney's fees requested and **ORDERS** Defendant to respond within **twenty-one (21) days** from Plaintiff's filing with any opposition.

**SO ORDERED**, this 11th day of September, 2019.

_____

R. STAN BAKER
UNITED STATES DISTRICT JUDGE
SOUTHERN DISTRICT OF GEORGIA

---

fact, during early settlement discussions, only made an issue about Plaintiff's related (but irrelevant) criminal charge. (See Docs. 16-9, 16-10.)